## MALLETT *v.* NORTH CAROLINA.

ERROR TO THE SUPREME COURT OF NORTH CAROLINA.

No. 189. Argued April 8, 1901. — Decided May 20, 1901.

Questions arising under the Constitution and laws of the United States were presented at the trial of this case in the Supreme Court of the State, and were decided against the party invoking their protection. Had that Court declined to pass on the Federal questions, and dismissed the petition without considering them, this Court would not undertake to revise their action.

The legislation of North Carolina in question in this case, did not make that a criminal act which was innocent when done; did not aggravate an offence or change the punishment and make it greater than it was when it was committed; did not alter the rules of evidence and require less or different evidence than the law required at the time of the commission of the offence; and did not deprive the accused of any substantial right or immunity possessed by them at the time of the commission of the

offence charged; and the law granting to the State the right of appeal from the Superior Court to the Supreme Court of the State was not an *ex post facto* law.

The contention that the plaintiffs in error were denied the equal protection of the laws because the State was allowed an appeal from the Superior Court of the Eastern, and not from the Western District of the State, is not well founded.

It appears by the statement of the plaintiffs in error in their petition for a reargument, that no Federal question was raised or considered in the criminal court or in the Superior Court in respect to the admission of the evidence; and therefore there was no basis on which to claim error in this respect in those courts; nor did the Supreme Court in passing on the contention, deal with it as a Federal question, but as a mere question arising under the criminal law of the State; and hence there is nothing in its action for this court to review.

In September, 1898, John P. Mallett and Charles B. Mehegan were indicted and tried in the criminal court of the county of Edgecombe, North Carolina, for conspiracy to defraud: They were convicted and sentenced to two years' imprisonment in the common jail. They appealed to the Superior Court. The record was certified up by the clerk of the criminal court on April 1, 1899. The Superior Court reversed the verdict and judgment, and granted a new trial. From this judgment of the Superior Court the State appealed, on July 7, 1899, to the Supreme Court, which reversed the judgment of the Superior Court, and remanded the cause to the criminal court, with directions that the sentence imposed by that court should be carried into execution.

At the time of the commission of the offence, and at the time of the trial in the criminal court of Edgecombe County, the State of North Carolina was not entitled to appeal to the Supreme Court of the State from the judgment of the Superior Court granting the defendants a new trial. There are two district criminal courts in the State—the Eastern and the Western. In the eastern district, in which the county of Edgecombe is situated, the State, since March 6, 1899, by legislation of that date, is allowed to appeal to the Supreme Court from a judgment of the Superior Court granting a defendant a new trial, but such right of appeal is not allowed to the State from judgments of the Superior Court in cases on appeal from the west-

ern district criminal court. It thus appears that the right of appeal from the Superior Court to the Supreme Court was conferred upon the State after the commission of the offence and the trial in the criminal, and before the Superior Court had granted a new trial.

From the judgment of the Supreme Court of the State a writ of error was allowed to this court.

*Mr. F. H. Busbee* for plaintiffs in error.

*Mr. J. C. L. Harris* and *Mr. B. G. Green* for defendant in error.

MR. JUSTICE SHIRAS, after making the above statement, delivered the opinion of the court.

Before considering the errors assigned by the plaintiffs in error to the judgment of the Supreme Court of North Carolina, it is proper that we should dispose of the motion made by the counsel for the State to dismiss the writ of error, on the alleged ground that the record does not disclose that any Federal question was raised in either of the courts in which the case was heard, and that no such question was raised.

It is, of course, obvious that there was no opportunity for the defence to raise in the criminal court the question as to the validity, as against the defendants, of the legislation allowing an appeal to the Supreme Court, because that legislation was not enacted till after the trial had been concluded.

It would also seem that the question of the validity of that legislation, in its Federal aspect, was not raised or considered in the Superior Court. It is true that in that court error was alleged to the action of the criminal court in permitting evidence of certain statements in the books of the defendants, and which books had been seized by the sheriff under an attachment against the property of the defendants, to be used on the trial against the defendants and over their objection, and that contention was sustained by the Superior Court, and the new trial was granted for that and other reasons. But it does not

appear that the Superior Court was formally called upon to consider any Federal question.

But we are of opinion that questions arising under the Constitution and laws of the United States were presented in the Supreme Court of the State, and were by that court considered and decided against the party invoking their protection.

It is true, as we learn from the first opinion filed by the Supreme Court, that such Federal questions were not considered by that court, or, at all events, were not treated as Federal questions, but as questions arising under state laws. But the record discloses that, after that opinion had been filed but before it had been certified down, the defendants filed a petition for reargument, and presented the Federal questions on which they rely. The Supreme Court entertained the petition, and proceeded to discuss and decide the Federal questions. In support of the motion to dismiss numerous decisions of this court are cited to the effect that it is too late to raise a Federal question by a petition for a rehearing in the Supreme Court of a State after that court has pronounced its final decision. *Loeber* v. *Schroeder*. 149 U. S. 580; *Sayward* v. *Denny*, 158 U. S. 180; *Pim* v. *St. Louis*, 165 U. S. 273.

But those were cases in which the Supreme Court of the State refused the petition for a rehearing, and dismissed the petition without passing upon the Federal questions. In the present case, as already stated, the Supreme Court of North Carolina did not refuse to consider the Federal questions raised in the petition, but disposed of them in an opinion found in this record. *State* v. *Mallett*, 125 N. C. 718. Had that court declined to pass upon the Federal questions and dismissed the petition without considering them, we certainly would not undertake to revise their action.

The first contention we encounter in the assignments of error is that, as the statute which provides for an appeal from the Superior Court to the Supreme Court in criminal cases was not passed until after the commission of the offence charged and the trial in the criminal court, it was, as against the plaintiffs in error, *ex post facto* and in violation of Art. 1, sec. 10, of the Constitution of the United States.

The opinion of the Supreme Court stating the facts and disposing of this question is brief, and may be properly quoted:

"The next exception in the petition is that at the time of the commission of the offence the statute allowed no appeal to the State from the ruling of the Superior Court judge. But the defendant had no 'vested rights' in the remedies and methods of procedure in trials for crime. They cannot be said to have committed this crime relying upon the fact that there was no appeal given the State in such cases. If they had considered that matter they must have known that the State had as much power to amend section 1237 as it had to pass it, and they committed the crime subject to the probability that appeals in rulings upon matters of law would be given the State from these intermediate courts. At any rate, their complaint is of errors in the trial court, and when they appealed to the Superior Court they did so by virtue of an act which provided that the rulings of that court upon their case could be reviewed, at the instance of the State, in a still higher court. The appeal was certified up to the Superior Court April 1, 1899, and on July 7, 1899, the appeal was taken to this court. The statute regulating appeals from the Eastern District Criminal Court, chapter 471, Laws 1899, was ratified March 6, 1899."

The subject has been several times considered by this court. The first case was that of *Calder* v. *Bull*, 3 Dall. 386, where the important decision was made that the provision prohibiting *ex post facto* laws had no application to legislation concerning civil rights. But the opinion, delivered by Mr. Justice Chase, contains a classification of the criminal cases in which the provision is applicable:

"1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates the crime or makes it greater than it was when committed. 3d. Every law that changes the punishment and inflicts a greater punishment than the law annexed to the crime when committed. 4th. Every law that alters the legal rules of evidence, and receives less or different testimony than the law required at the

time of the commission of the offence in order to convict the offender."

In *Cummings* v. *Missouri*, 4 Wall. 277, and *Ex parte Garland*, 4 Wall. 333, a law which excluded a minister of the gospel from the exercise of his clerical functions, and a lawyer from practice in the courts, unless each would take an oath that they had not engaged in or encouraged armed hostilities against the Government of the United States, was held to be an *ex post facto* law, because it punished, in a manner not before prescribed by law, offences committed before its passage, and because it instituted a new rule of evidence in aid of conviction.

In *Kring* v. *Missouri*, 107 U. S. 221, will be found an elaborate review of the history of the *ex post facto* clause of the Constitution and of its construction by the Federal and the state courts. Kring was convicted of murder in the first degree, and the judgment of condemnation was affirmed by the Supreme Court of Missouri. A previous sentenced pronounced on his plea of murder in the second degree and subjecting him to an imprisonment for twenty-five years had, on his appeal, been reversed and set aside. By the law of Missouri in force when the homicide was committed this sentence was an acquittal of the crime of murder in the first degree; but before his plea of guilty was entered the law was changed; so that by the force of its provisions, if a judgment on that plea be lawfully set aside, it shall not be held to be an acquittal of the higher crime; and it was held, four of the justices dissenting, that, as to this case, the new law was an *ex post facto* law, and that he could not again be tried for murder in the first degree.

In *Hopt* v. *Utah*, 110 U. S. 574, 589, one of the questions presented was, whether a law which made it competent for witnesses to testify to the commission of a crime who were incompetent to so testify at the time the crime was so committed, was an *ex post facto* law, and it was unanimously held otherwise. *Kring* v. *Missouri* was cited and relied on by the plaintiff in error, and was disposed of by the court, *per* Mr. Justice Harlan, in the following observations:

. "That decision proceeded upon the ground that the state constitution deprived the accused of a substantial right which the

law gave him when the offence was committed, and, therefore, in its application to that offence and its consequences altered the situation of the party to his disadvantage. By the law as established when the offence was committed, Kring could not have been punished with death after his conviction of murder in the second degree, whereas by the abrogation of that law by the constitutional provision subsequently adopted, he could thereafter be tried and convicted of murder in the first degree. Thus the judgment of conviction of murder in the second degree was deprived of all force as evidence to establish his absolute immunity thereafter from punishment for murder in the first degree. This was held to be the deprivation of a substantial right which the accused had at the time the alleged offence was committed.

" But there are no such features in the case before us. Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not attach criminality to any act previously done, and which was innocent when done; nor aggravate any crime theretofore committed; nor provide a greater punishment therefor than was prescribed at the time of its commission; nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed. The crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute. Any statutory alteration of the legal rules of evidence which would authorize conviction upon less proof, in amount or degree, than was required when the offence was committed, ought, in respect of that offence, to be obnoxious to the constitutional inhibition upon *ex post facto* laws. But alterations which do not increase the punishment nor change the ingredients of the offence, or the ultimate facts necessary to establish guilt, but, leaving untouched the nature of the crime and the amount or degree of proof essential to conviction, only remove existing restrictions upon the competency of certain

classes of persons as witnesses, relate to modes of procedure only, in which no one can be said to have a vested right, and which the State, upon grounds of public policy, may regulate at pleasure. Such regulations of the mode in which the facts constituting guilt may be placed before the jury, can be made applicable to prosecutions or trials thereafter had, without reference to the date of the commission of the offence charged."

In *Gibson* v. *Mississippi*, 162 U. S. 565, it was held that the Mississippi Code, in force when the indictment was found, did not affect in any degree the substantial rights of those who had committed crime prior to its going into effect; it did not make criminal and punishable any act that was innocent when committed, nor aggravate any crime previously committed, nor inflict a greater punishment than the law annexed to such crime at the time of its commission, nor alter the legal rules of evidence in order to convict the offender. That the inhibition upon the passage of *ex post facto* laws does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed. That the mode of trial is always under legislative control, subject only to the condition that the legislature may not, under the guise of establishing modes of procedure and prescribing remedies, violate the accepted principles that protect an accused person against *ex post facto* enactments.

In *Thompson* v. *Missouri*, 171 U. S. 380, it was held that an act of the legislature of Missouri, providing that comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine, shall be permitted to be made by witnesses, and such writings and the evidence of witnesses respecting the same may be submitted to the court and jury as evidence of the genuineness or otherwise of the writing in dispute, is not *ex post facto*, under the Constitution of the United States, when applied to prosecutions for crimes committed prior to its passage. In the opinion in this case the previous decisions were again reviewed, and the following passage from Cooley's Treatise on Constitutional Limitations was quoted with approval:

"So far as mere modes of procedure are concerned a party

has no more right, in a criminal than in a civil action, to insist that his case shall be disposed of under the law in force when the act to be investigated is charged to have taken place.   Remedies must always be under the control of the legislature, and it would create endless confusion in legal proceedings if every case was to be conducted only in accordance with the rules of practice, and heard only by the courts in existence when its facts arose.   The legislature may abolish courts and create new ones, and it may prescribe altogether different modes of procedure in its discretion, although it cannot lawfully, we think, in so doing, dispense with any of those substantial protections with which the existing law surrounds the person accused of crime." (Chap. 9, p. 272, 5th ed.)   See likewise *Duncan* v. *Missouri*, 152 U. S. 377.

Applying the principles established by these cases to the facts of the present case, we think it may be concluded that the legislation of North Carolina in question did not make that a criminal act which was innocent when done; did not aggravate an offence or change the punishment and make it greater then when it was committed; did not alter the rules of evidence, and require less or different evidence than the law required at the time of the commission of the offence; and did not deprive the accused of any substantial right or immunity possessed by them at the time of the commission of the offence charged.

It must not be overlooked that, when the plaintiffs in error perfected their appeal from the Criminal Court, by procuring its certification, on April 1, 1899, to the Superior Court, the new law, ratified on March 6, 1899, provided that the State could have the decision of that court reviewed by the Supreme Court.

Upon the whole, therefore, we agree with the Supreme Court of North Carolina in holding that the law granting the right of appeal to the State from the Superior to the Supreme Court of the State was not an *ex post facto* law within the meaning of the Constitution of the United States.

The further contention, that the plaintiffs in error were denied the equal protection of the laws because the State was allowed

an appeal from the Superior Court of the Eastern, and not from the Western, District of the State, is not well founded.

In *Missouri* v. *Lewis*, 101 U. S. 22, it was held that, by the Fourteenth Amendment of the Constitution of the United States, a State is not prohibited from prescribing the jurisdiction of the several courts, either as to their territorial limits, or the subject-matter, amount or finality of their respective judgments or decrees; and that where, by the constitution and laws of Missouri, the St. Louis Court of Appeals has exclusive jurisdiction in certain cases of all appeals from the circuit courts in St. Louis and some adjoining counties, and the Supreme Court has jurisdiction of appeals in like cases from the circuit courts of the remaining counties of the State, such an adjustment of appellate jurisdiction is not forbidden by anything contained in the Fourteenth Amendment. It was said by Mr. Justice Bradley, giving the opinion of the court:

"Each State has the right to make political subdivisions of its territory for municipal purposes, and to regulate their local government. As respects the administration of justice, it may establish one system of courts for cities and another for rural districts, one system for one portion of its territory and another system for another portion. Convenience, if not necessity, often requires this to be done, and it would seriously interfere with the power of a State to regulate its internal affairs to deny it this right. We think it is not denied or taken away by anything in the Constitution of the United States, including the Amendments thereto . . . If every person residing or being in either portion of the State should be accorded the equal protection of the laws prevailing there, he could not justly complain of a violation of the clause referred to. For, as before said, it has respect to persons and classes of persons. It means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances. The Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two States separated only by an imaginary line. On one side of the line

there may be a right of trial by jury, and on the other no such right. Each State prescribes its own modes of judicial proceedings. If diversities of laws and of judicial proceedings may exist in the several States without violating the equality clause of the Fourteenth Amendment, there is no solid reason why there may not be such diversities in different parts of the same State. A uniformity which is not essential as regards different States cannot be essential as regards different parts of a State, provided that in each and all there is no infraction of the constitutional provision."

The principles of this case have been approved and applied in several subsequent cases. *Hallinger* v. *Davis*, 146 U. S. 314, 322; *Hodgson* v. *Vermont*, 168 U. S. 262; *Holden* v. *Hardy*, 169 U. S. 366; *Brown* v. *New Jersey*, 175 U. S. 172.

We, therefore, see no error in the action of the Supreme Court of North Carolina in holding that the State has control of its own legislation as to the cases in which it will permit appeals in its own behalf in its courts.

There remains to consider the contention that, in the trial in the criminal court, by the use of certain books of account belonging to them, the plaintiffs in error were thereby made to be witnesses against themselves, and thus their privileges and immunites as citizens of the United States have been abridged, and they are deprived of their liberty without due process of law, contrary to the Fourteenth Amendment to the Constitution of the United States.

In the petition for a rehearing in the Supreme Court, which, as we have seen, is the only part of the record on which the plaintiffs in error can rely as raising Federal questions, the point was thus presented:

"That prior to the beginning of this action an attachment against the property of the defendant was issued at the instance of J. M. Baker, administrator of M. L. Woolard and of Solomon Woolard, who is the chief prosecuting witness in this case. By virtue of said attachment the sheriff of Edgecombe County seized the ledger and counter book of the defendants and has kept possession of them up to this time. At the trial of the present indictment the said books so wrongfully taken from the defend-

ants were offered in evidence. The defendants objected; the objection was overruled, and the defendants excepted. In this the defendants submit there was error. For it is, in effect, making the defendants give evidence against themselves under the principles laid down in the case of *Boyd* v. *United States*, 116 U. S. 616. At the argument of this case at this term counsel had not found this authority, and their argument did not go upon this ground. Since said hearing they found said case, and they are advised that the principle and the authority are decisive, and would at once satisfy the court of the defendants' right to a new trial, if the matter could be brought to its attention."

The only ground of objection shown by the record to have been taken by defendants' counsel to the admission of this evidence was "because the testimony now offered was subsequent to the examination in the supplementary proceedings."

Nothing seems to have been claimed, either in the criminal court or in the Superior Court, as to the inadmissibility of the books as evidence on the ground of any provision of the Federal Constitution. The Supreme Court thus treated the subject:

"We will consider now the only exception which the petition to reargue insists the judge of the Superior Court should have passed upon and held in favor of the defendant, *i. e.*, that the sheriff, by attachment, having seized the ledger and counter book of the defendants, they were put in evidence against them. There was certainly no error in using the defendants' own entries against them. The shoes of a party charged with crime can be taken and fitted to tracks as evidence, and in one case, when a party charged with crime was made to put his foot into the tracks, the fact that it fitted was held competent. *State* v. *Graham*, 74 N. C. 646. Nor has it ever been suspected that if, upon a search warrant, stolen goods are found in the possession of the prisoner, that fact cannot be used against him. Here the books came legally into the possession of another, and the tell-tale entries were competent against the parties making them in the course of their business."

It therefore appears by the statement of the plaintiffs in error in their petition for a reargument that no Federal question was

raised or considered in the Criminal Court or in the Superior Court, in respect to the admission of the evidence. So that there was no basis on which to claim error in this respect in those courts. Nor did the Supreme Court, in passing upon the contention, deal with it as a Federal question, but as a mere question arising under the administration of the criminal law of the State, and there is, therefore, nothing in its action for us to review.

But we do not wish to be understood as implying that, even if this question had been duly presented in the state courts as a Federal question, there was error in admitting the evidence complained of.

The judgment of the Supreme Court of North Carolina is

*Affirmed.*