**E. David KEISER**

v.

**Honorable John C. BELL, Jr., Chief Justice of Pennsylvania, et al.**

**Civ. A. No. 71–199.**

United States District Court,
E. D. Pennsylvania.

Aug. 19, 1971.

Stanford Shmukler, Morton Witkin, Philadelphia, Pa., for plaintiff.

J. Shane Creamer, Atty. Gen. Pa., F. John Hagele, Peter W. Brown, Deputy Attys. Gen., Harrisburg, Pa., for defendants.

## OPINION

HIGGINBOTHAM, District Judge.

### I.

### INTRODUCTION

In November, 1965, the plaintiff, E. David Keiser, was re-elected as Magistrate of the City of Philadelphia, having first been elected to that office in 1941 and continuously re-elected between 1941 and 1965. Plaintiff was a part of what in Philadelphia has now become an extinct specie of the Judiciary; for though neither a lawyer nor formally trained in the law, plaintiff was one of several laymen who were permitted to serve as a Magistrate in the City of Philadelphia—exercising important judicial responsibilities on both criminal and civil matters. Following adoption of the amendment to the Judicial Article of the Pennsylvania Constitution, P.S., on April 23, 1968, effective January 1, 1969, particularly Article 5, Section 6 and Schedule to Article 5, Section 16(e), the plaintiff was designated as a non-law judge of the newly created Municipal Court, which supplanted and replaced the office of Magistrate and Board of Magistrates, and was sworn into office pursuant to that designation.

In August of 1966, the plaintiff was indicted by the Philadelphia Grand Jury in a twenty-one count indictment (Nos. 1862–1882, August 29, 1966) charging, inter alia, conspiracy to obstruct public justice, obstruction and perversion of public justice, bribery and extortion. The alleged factual basis of the indictments was that the plaintiff in January, 1964, had accepted $2600.00 for attempting to influence a judicial decision regarding the sentencing of a defendant in the Courts of Chester County, and further, that the plaintiff had received $3,-000.00 "on behalf of Edmund J. Mancini" in return for assurances by Keiser that a prosecution pending against Mancini would be disposed of without the imposition of a sentence of imprisonment. Shortly after the return of these indictments, the plaintiff was not assigned any judicial duties, although he continued to receive his salary and to earn accrued pension rights until January, 1971.

There is an intriguing irony in plaintiff's multifaceted positions as to the extent of his purported medical disability. As to the serious felony indictments untried and pending against him for almost five years, he claims that his heart condition is of such disabling

proportions that "great risk" to his health would be involved in any proceedings wherein *he* was the defendant. However, when it pertains to collecting a bi-weekly pay check as a judge, plaintiff asserts that he is well enough to preside over those proceedings where he will be adjudicating the important rights and liberties of other defendants who are charged with commission of crimes.[1] As to the proceedings resulting from the complaint filed against him by the Pennsylvania Judicial Inquiry and Review Board (hereinafter referred to as the "Judicial Board"), plaintiff's resourceful counsel requested " * * * that the Board shall not complete the matter until Mr. Keiser has had an opportunity to be heard." (Hearing, June 1, 1970, N.T., p. 22), since plaintiff " * * * can appear at times." (Hearing, June 1, 1970, N.T., p. 25). Though plaintiff attended portions of the proceedings before the Judicial Board, he neither testified nor did he present any evidence in refutation of the major charges that he received $5,-600.00 for the purpose of influencing or attempting to influence judicial decisions in state courts so that two persons could be placed on probation. However, the particularly patient presiding Judge of the Judicial Board gave him ample opportunity to present any evidence or witnesses in his behalf.[2]

As part of the 1968 Amendment to the Pennsylvania Constitution, Article 5, Section 18 was added, providing for the creation of a Judicial Inquiry and Review Board to hear complaints, evaluate evidence, and make recommendations to the Pennsylvania Supreme Court concerning the "suspension, removal, discipline, or compulsory retirement of justices or judges." Article 5, Section 18 (e). Pursuant to procedures mandated by the Pennsylvania Supreme Court for the Judicial Inquiry and Review Board (Order No. 512, Miscellaneous Docket No. 16) (June 27, 1969), the plaintiff was formally charged with "misconduct in office," "conduct which prejudices the proper administration of justice," and conduct bringing "into disrepute" the "judicial office of Magistrate and Judge in the City of Philadelphia." [3] The basis of these charges was the plaintiff's alleged receipt of payment to influence the outcome of cases pending in the state courts.

On May 20, 1970, plaintiff filed in the Dauphin County Court, Commonwealth Docket No. 204–1970, a complaint in mandamus against the Judicial Board and against the Honorable Vincent A. Carroll, then President Judge of the

---

1. See plaintiff's Preliminary Objections to the Complaint of the Judicial Board, ¶ 14: " * * * there is no medical evidence that Respondent [Keiser] is unable to perform his judicial duties."

2. Hearing, June 1, 1970, (N.T., pp. 23, 24 and 25):
"JUDGE MONTGOMERY: We do not interpret it to mean we shall continue this indefinitely after we have completed the testimony, until such time as you and Mr. Keiser desire to appear. We shall give you the opportunity to present anything you wish at the conclusion of this testimony.
 * * * * *
"JUDGE MONTGOMERY: I am merely expressing my opinion. From what you have told me, that's my interpretation of it, that we can't give an indefinite postponement, but that we would proceed, and if we complete the taking of testimony before you present Mr. Keiser, then we shall give him another and further opportunity to present himself if he wishes to present any evidence.
"MR. WITKIN: I would have to say in all candor I think that is a correct statement.
"JUDGE MONTGOMERY: Very well.
"MR. WITKIN: Judge Keiser will appear. In other words, he will appear, he is able medically to do certain things, and certain things would be at the risk of—let's be very frank about it, of his life with that pacemaker. But he can appear at times. For example, today he has been around since 9:15 this morning and he had to go home at one o'clock. I mean, I couldn't keep him or take the responsibility of keeping him."

3. Judicial Board Complaint, p. 7.

Court of Common Pleas of Philadelphia County, seeking, *inter alia*, to restrain the proceedings until a judicial decision could be obtained pertaining to preliminary objections he had filed with the Judicial Board. On May 29, 1970, after hearing oral argument, the Dauphin County Court dismissed his petition on the ground that it lacked jurisdiction in mandamus over the Judicial Board. An appeal was filed in the Supreme Court of Pennsylvania on June 1, 1970 (May Term, 1971, No. 11); a petition for supersedeas seeking a stay of proceedings before the Judicial Board was denied by that Court, permitting hearings before the Judicial Board to take place on June 1 and 2, 1970, and July 20, 1970, and August 5, 1970. On June 28, 1971, plaintiff's petition to the Pennsylvania Supreme Court from the order of the County Court of Dauphin County refusing to assert jurisdiction in mandamus over the Judicial Board was dismissed by the Pennsylvania Supreme Court. On the basis of the formal proceedings instituted against Judge Keiser, the Judicial Board on November 25, 1970, recommended to the Pennsylvania Supreme Court that he be permanently removed from judicial office. On January 21, 1971, the Supreme Court of Pennsylvania entered an order, effective as of that date, accepting the recommendation of the Board that plaintiff be removed as non-law judge of the Municipal Court of Philadelphia.

On January 26, 1971, plaintiff filed the complaint in issue in this Court. The matter has been briefed thoroughly, and a final pretrial conference was held on August 18, 1971. By reason of the Pennsylvania Supreme Court's decisions of January 21, 1971 and June 28, 1971, there are apparently no other procedures

under Pennsylvania law whereby plaintiff could further challenge the order of the Pennsylvania Supreme Court directing his removal from judicial office.

After carefully considering plaintiff's extensive claims for relief, I have concluded that the plaintiff's contentions are without merit and that the Order of the Pennsylvania Supreme Court removing him from judicial office should not be disturbed. Further, I find that plaintiff has not met his burden in establishing "[a] substantial claim of unconstitutionality"[4] to require the convening of a three-judge district court, and thus his request for a three-judge court is denied.

## II. JURISDICTION

Asserting that jurisdiction is properly founded on 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983, the plaintiff seeks the convening of a three-judge court pursuant to 28 U.S.C. §§ 2281 and 2284, and an interlocutory and permanent injunction restraining the enforcement, operation and execution of Article 5, Section 18 and Schedule to Article 5, Section 24 of the Pennsylvania Constitution as applied to plaintiff. The plaintiff also seeks a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

The plaintiff claims that Article 5, Section 18 is constitutionally invalid on its face and as applied to him for the following reasons:

(1) Article 5, Section 18(d) of the Pennsylvania Constitution, authorizing suspension or removal of judges for "misconduct in office" is unconstitutionally vague.[5]

(2) The publication to plaintiff of the procedures authorized by Article 5, Section 18 resulted in the denial of due

---

4. Ex parte Poresky, 290 U.S. 30, 31, 54 S.Ct. 3, 78 L.Ed. 152; see also the discussion at pp. 8–9, *infra.*

5. Plaintiff's initial complaint did not allege that the Pennsylvania Constitutional provision in issue was unconstitutionally vague. Plaintiff, however, subsequently filed a motion to amend the complaint by adding the allegation that Article

5, Section 18(d) was unconstitutionally vague. Defendant opposes the motion to amend. While there is authority supporting defendants' position, (see Moore's Federal Practice, 2d Ed., ¶ 15.08, at pp. 827–836) the motion to amend is granted, and the amended complaint is considered to be subject to the same motion to dismiss previously filed by the defendant.

process to plaintiff (a) when the Judicial Board permitted its executive secretary to serve as complainant, prosecutor and fact-finder and as a voting member of the Board; and (b) when the Pennsylvania Supreme Court refused to accept briefs or hear oral argument on plaintiff's objection to the recommendation of the Judicial Board.

(3) The proceedings before the Judicial Board and the final order of the Supreme Court of Pennsylvania removing the plaintiff from his judicial office violated his right to trial by jury under the Sixth and Fourteenth Amendments in that (a) plaintiff's removal, on the ground of his alleged commission of the acts of bribery and extortion with which he was charged but never tried, "assumed" his criminal guilt without trial; and (b) the plaintiff's Sixth Amendment right to confront the witnesses against him was denied when the transcript of testimony given by a witness who did not appear at his hearing (but who was "not legally unavailable" for the hearing) was admitted into evidence against him.

(4) The discipline of plaintiff pursuant to Article 5, Section 18, which became effective after the commission of the acts of misconduct with which he was charged, constitute the application to plaintiff of an impermissible *ex post facto* law.

## III. CONVENING OF A THREE-JUDGE COURT

The first question before me is whether it is necessary and apporpriate to convene a three-judge court, pursuant to 28 U.S.C., §§ 2281 and 2284,[6] to determine and grant appropriate relief concerning the constitutional claims advanced by plaintiff. For rea-

sons stated herein, I have determined that the convening of a three-judge court is not appropriate.

The plaintiff seeks the convening of a three-judge District Court for the determination of allegedly substantial constitutional challenges to the standards and procedures under which he was removed from judicial office in Pennsylvania. At the outset, it is clear that a three-judge court is properly convened only if the plaintiff seeks to enjoin the enforcement of an allegedly unconstitutional statute of statewide application. In contrast, a challenge to the unconstitutional application of a valid state law does not justify the convening of a three-judge court. The statutory purpose of requiring the convening of a three-judge court is to provide "procedural protection" against "state-wide doom by a federal court of a state's legislative policy." Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800 (1941). Writing for a unanimous Court in *Phillips*, Justice Frankfurter noted that although "[s]ome constitutional or statutory provision is the ultimate source of all actions by state officials * * * an attack on lawless exercise of authority * * * is not an attack upon the constitutionality of a statute conferring the authority * *." 312 U.S. at 252, 61 S.Ct. at 484.

The only allegation which presents a potential basis for the convening of a three-judge court is the claim that Article 5, § 18(d) of the Pennsylvania Constitution, authorizing suspension or removal of judges for "misconduct in office" is unconstitutionally vague. Because the facial attack on this Constitutional provision as void for vagueness is insubstantial, however, the convening of a three-judge court is not warranted.

---

6. 28 U.S.C. § 2281 provides as follows:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

Article 5, Section 18(d) of the Pennsylvania Constitution provides:

"(d) Under the procedure prescribed herein, any justice or judge may be suspended, removed from office or otherwise disciplined for violation of section seventeen of this article, misconduct in office, neglect of duty, failure to perform his duties, or conduct which prejudices the proper administration of justice or brings the judicial office into disrepute and may be retried for disability seriously interfering with the performance of his duties."

In Ex parte Poresky, 290 U.S. 30, 31, 54 S.Ct. 3, 4, 78 L.Ed. 152, the Supreme Court said that "[a] substantial claim of unconstitutionality" is necessary for the convening of a three-judge court, and that the statute "does not require three judges to pass upon this initial question of jurisdiction." The Court further said:

"The existence of a substantial question of constitutionality must be determined by the allegations of the bill of complaint. Mosher v. [City of] Phoenix, 287 U.S. 29, 30, 53 S.Ct. 67, 77 L.Ed. 148; Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 105, 53 S.Ct. 549, 550, 77 L.Ed. 1062. The question may be plainly unsubstantial either because it is 'obviously without merit' or because 'its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy.' Levering & Garrigues Co.

v. Morrin, supra; Hannis Distilling Co. v. Baltimore, 216 U.S. 285, 288, 30 S.Ct. 326, 54 L.Ed. 482; McGilvra v. Ross, 215 U.S. 70, 80, 30 S.Ct. 27, 54 L.Ed. 95.

"While it is appropriate that a single District Judge to whom application is made for an interlocutory injunction restraining the enforcement of a state statute should carefully scrutinize the bill of complaint to ascertain whether a substantial question is presented, to the end that the complainant should not be denied opportunity to be heard in the prescribed manner upon a question that is fairly open to debate, the District Judge clearly has authority to dismiss for the want of jurisdiction when the question lacks the necessary substance and no other ground of jurisdiction appears." 290 U.S. at 32, 54 S.Ct. at 4–5.

■ While certainly no plaintiff entitled to a three-judge court should be denied one, it is clear that these courts constitute "a serious drain upon the federal judicial system" and thus the district judge should carefully scrutinize the complaint to ascertain whether the plaintiff has met the prerequisite standard required for the convening of a three-judge court. (See: Jones v. Branigin, 433 F.2d 576, 577 (6th Cir. 1970); Note, The Three-Judge District Court and Appellate Review, 49 Va.L.Rev. 538 (1963). The specific standards of misconduct set forth in Article 5, Section 17, which under Article 5, Section 18 provide a basis for the removal of a judge from office, clearly are not violative of due process because of impermissible vagueness.[7] These con-

---

7. The present Article 5, Section 18 was adopted on April 23, 1968, after the occurrence of the alleged misconduct with which plaintiff was charged. The plaintiff contends that the *application* of the newly enacted Article 5, Section 18, to him is constitutionally invalid as an *ex post facto* law. The merits of this claim will be considered *infra*. In regard to the convening of a three-judge court, however, plaintiff must be understood to contend that *if* the application of the present Section 18 to him is *not* invalid as an *ex*

*post facto* law, it is nevertheless void for vagueness. The contention that the *application* of a particular statute to an individual would be invalid as an *ex post facto* law does not justify the convening of a three-judge court, under Phillips v. United States, discussed *supra*. A determination that Article 5, Section 18, as applied to plaintiff is invalid as an *ex post facto* law would not result in "state-wide doom by a federal court of a state's legislative policy." 312 U.S. at 251, 61 S.Ct. at 483.

stitutional provisions cannot be said to provide a standard "which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application * * *." Connally v. General Const. Co., 269 U.S. 385 at 391, 46 S.Ct. 126 at 127, 70 L.Ed. 322 (1926). The Void for Vagueness Doctrine, 109 U.Pa.L.Rev. 67 (1960).

In Sarisohn v. Appellate Division, 265 F.Supp. 455 (D.C.1967) a section of the New York State Constitution, providing for the removal of a lower court judge "for cause" was attacked as void for vagueness. The District Court concluded that the challenge to the "for cause" standard for removal, on grounds of vagueness, was "insubstantial" and accordingly provided "no reason to invoke a three-judge court." (265 F.Supp. at 459.) The Court pointed out that "[t]he words 'for cause' mean for a cause to be enumerated and specified in each particular instance so that the defendant may be duly notified and adequately prepared to defend the charges." (at 458). With particular relevance to the present case, the Court noted: "it would be impossible to enumerate in any statute all the possible grounds" for removal of a judicial officer. "Guidelines may be found in the Canons of Ethics, applicable to both attorneys and judges, adopted by the American Bar Association and other bar associations, and also in the general moral and ethical standards expected of judicial officers by the community." (265 F.Supp. at 458.)

Here, the provisions of the Pennsylvania Constitution which plaintiff attacks on grounds of vagueness are no more vulnerable than the "for cause" standard of the New York Constitution upheld in *Sarisohn*. I conclude that the plaintiff's attack on Article 5, Section 18 as void for vagueness is insubstantial, and does not warrant the convening of a three-judge court.

## IV. DENIAL OF DUE PROCESS AND EQUAL PROTECTION

The plaintiff asserts that the procedures followed by the Judicial Board and by the Pennsylvania Supreme Court in effecting his removal from office violated his rights under the Sixth and Fourteenth Amendments. Five specific claims concerning the alleged denial of due process and equal protection and substantive criminal rights defined by the Sixth Amendment are advanced: (1) the recommendation of the Judicial Inquiry and Review Board and the Order of the Supreme Court purport to make a determination of criminal guilt without trial before judge and jury (Complaint, ¶ 26); (2) the recommendations and Order presumed plaintiff's guilt (Complaint, ¶ 27); (3) plaintiff was denied the right to confront his accusers (Complaint, ¶ 30); (4) a member of the Judicial Inquiry and Review Board served as fact-finder, judge, juror, investigator and complainant (Complaint, ¶ 28); and (5) plaintiff was afforded no hearing before nor right to submit briefs to the Supreme Court prior to entry of the Order (Complaint, ¶¶ 29 and 31).

After carefully considering the claims raised by plaintiff in this regard, I have concluded that all of these claims are without merit and in no way justify setting aside the Order of the Pennsylvania Supreme Court, approving the recommendation of the Judicial Board, that plaintiff be removed from judicial office.

### A. DENIAL OF EQUAL PROTECTION

None of the allegations appear on their face to disclose elements of discrimination or improper classification necessary to bring into question the equal protection of the law. The test of denial of equal protection was stated at length in Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944), in which a challenge was posed to the state's incorrect certification of the results of

a primary election, and the ensuing deprivation of the complainant's right to be elected to state office. The Supreme Court held that the complaint, brought pursuant to the Civil Rights Act of 1871, was properly dismissed below for failure to state a cause of action. Noting the absence of allegations of intentional or purposeful discrimination between persons or classes by the State Board, 321 U.S. at 8, 64 S.Ct. at 401, the Supreme Court continued:

> "But not every denial of a right conferred by state law involves a denial of the equal protection of the laws, even though the denial of the right to one person may operate to confer it on another. Where, as here, a statute required official action discriminating between a successful and an unsuccessful candidate, the required action is not a denial of equal protection since the distinction between the successful and the unsuccessful candidate is based on a permissible classification. And where the official action purport to be in conformity to the statutory classification, an erroneous or mistaken performance of the statutory duty, although a violation of the statute, is not without more a denial of the equal protection of the laws.

> "The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination."

█ The Complaint here does not allege discrimination or improper classification by the Judicial Board or by the Pennsylvania Supreme Court. The only classification imposed by the state Constitution and administered under the Supreme Court procedures is that between a fit and unfit judge, which is a reasonable and appropriate classification. In light of the *Snowden* test, therefore, the complaint on its face presents no question concerning the federal Constitution's guarantee of equal protection of the law.

## B. DENIAL OF RIGHTS GUARANTEED TO THE CRIMINAL DEFENDANT.

█ On the premise that the disciplinary action against plaintiff was essentially criminal in nature, the plaintiff claims that important rights guaranteed to a criminal defendant under the Sixth and Fourteenth Amendments were denied to him. Specifically, he claims that the recommendation of the Judicial Board, and the Order of the Supreme Court removing plaintiff from judicial office purported to make a "determination of criminal guilt without trial before judge and jury"; that the recommendation and Order removing plaintiff from office "presumed plaintiff's guilt" and that the plaintiff was denied the right to confront his accusers.

These claims are without merit. The premise on which plaintiff proceeds—that the Judicial Board proceedings and the sanction of removal from office are criminal in nature—is clearly erroneous.

The proceedings of the Judicial Board are investigatory and advisory and are not binding upon the Supreme Court.[8] No determination of criminal guilt is made, but merely a determination of the Judicial Board's view of the conformity of the subject of investigation to the state constitutional standards for judicial office. Similarly, the resulting Order of the Supreme Court does not operate as a sanction for criminal guilt but as a judgment on judicial fitness. At most, the proceedings of the Judicial Board could be characterized as quasi-judicial administrative hearings, and the Order of the Supreme Court as a judicial disciplinary order. See, e. g., Kane v. Rudich, 256 App.Div. 586, 10 N.Y.S.2d 929 (2d Dept. 1939) (an action to remove magistrate for cause, rules

8. Rule 18, Procedure for The Judicial Inquiry and Review Board Complaint, Exhibit A.

governing testimony in criminal cases do not apply); Sharpe v. State ex rel. Oklahoma Bar Ass'n., 448 P.2d 301 (Okla.Jud.1968), cert. den. 394 U.S. 904, 89 S.Ct. 1011, 22 L.Ed.2d 216 (removal from judicial office and disqualification from other public office not a criminal proceeding and right to jury trial does not obtain).

The specific claim that the plaintiff was denied his right under the Sixth and Fourteenth Amendments to confront his accusers is similarly without merit. "The objection that a judge has a right to confront his accusers seems inopposite in [the] context [of a disciplinary proceeding] which is not a criminal proceeding but an inquiry into whether the judge is fit to continue to hold a public trust." [9]

■ The contention that the recommendation and Order of removal implicitly presumed plaintiff's guilt is similarly groundless. Faced with the indictment of a judge on 21 bills charging obstruction and perversion of justice and bribery and extortion, the state judiciary should not be powerless to conduct a thorough investigation and to take appropriate disciplinary action to protect its integrity. This essential investigative and disciplinary action is, however, in no way presumed to make a criminal determination of plaintiff's guilt.

■ The view that the essential nature of the proceedings and the sanction imposed were not criminal in nature is consistent with the conclusion that the removal of plaintiff from judicial office constituted "punishment" *under the ex post facto clause of the Constitution.*[10] The decisions of the United States Supreme Court in *Garland* [10a] and *Cummings,*[10b] compel the conclusion that denial of the right to practice "the professions and avocations" of life constituted punishment for purposes of applying the constitutional guarantee

against *ex post facto* laws. But neither *Garland* nor *Cummings* decided, or even suggested that the denial of the right to practice a profession or hold public office *ipso facto* constituted criminal punishment, thereby bringing into play the full panoply of rights guaranteed to a criminal defendant by the Sixth Amendment, and now made applicable to the states by the Fourteenth Amendment.

## C. DENIAL OF PROCEDURAL DUE PROCESS.

■ Even if the disciplinary proceedings against plaintiff are not viewed as essentially criminal in nature, the plaintiff claims that his removal from office resulted in the denial of procedural due process guaranteed by the Fourteenth Amendment. Specifically, the plaintiff claims that it was a denial of procedural due process for the Judicial Board to permit its executive secretary to serve as "complainant, prosecutor and fact-finder, and as a voting member of the Board." The complaint initially filed against plaintiff before the Judicial Board was verified by two affidavits, one of which was executed by Richard E. McDevitt, Esquire, Executive Director and member of the Board. In his affidavit, Mr. McDevitt swore that the facts set forth in the complaint which are of his own knowledge were true and correct and those which were obtained from third parties, he believed to be true and correct. Thereafter, Mr. McDevitt proceeded to sit as a member of the committee which made the findings of fact, and participated as a member of the Judicial Board which made the recommendation to the Supreme Court that plaintiff be removed from judicial office.

A considerable and not always consistent body of law has developed concerning the question of the degree to

9. "Remedies for Judicial Misconduct and Disability: Removal and Discipline of Judges", 41 N.Y.U.L.Rev. 149, 194, (1966).

10. See pp. 22-30, *infra.*

10a. 71 U.S. 333, 18 L.Ed. 366 (1866).

10b. 71 U.S. 277, 18 L.Ed. 356 (1866).

which the combination of prosecutorial, investigative and adjudicatory functions within a single administrative officer, panel, or organization is consistent with due process. An evaluation of the case law, and scholarly and popular polemics on this topic should start with the sensitive perspective of Professor Davis:

"The first step in any sound analysis [of combination of functions] is to recognize that broadside condemnation or approval of combination of functions is likely to be the product of ignorance. The next step is to appreciate the need for highly particularized solutions. Generalizations which are sound for one type of activity may be nonsense for another. Each kind of combination must be examined not in the abstract or in general, but in the context of a particular administrative activity." (Davis, Administrative Law, § 13:01, pp. 174–75.)

With this perspective as a starting point, it should be recognized that myriad combinations of investigatory and adjudicatory functions in the same official or administrative body have been found to be constitutional. The Court of Appeals for the Third Circuit approved this practice in Belizaro v. Zimmerman, 200 F.2d 282 (3rd Cir., 1952):

"Is it unconstitutional to allow the same officer to be an investigating and a hearing official? Desirable or not, such had been the case in many instances up to the time of the Administrative Procedure Act. It may well be that the elimination of these proceedings from the Act is undesirable. But it can hardly be thought to be unconstitutional, for it was a system with which the country lived for a very long time before the changes brought about by the Administrative Procedure Act were adopted." (200 F.2d at 283).

In other deportation cases, the Courts of Appeals have refused to hold that the commingling of prosecuting and judging in immigration officers is a denial of due process. Rather than finding any mingling of investigatory and adjudicatory functions to be a *per se* violation of due process, well reasoned decisions have required competent proof of actual bias in the proceedings. "The fact that the one chosen to hear the evidence was an investigator in the Immigration Service, he not being shown to have been disqualified by personal bias or prejudice, is without significance." United States ex rel. Dolenz v. Shaughnessy, 200 F.2d 288, 291 (2d Cir. 1952).

"[W]hile we do not think that the practice of having the inspector act as judge, investigator, prosecutor, and witness is by any means ideal, yet, in the absence of any showing from which it can be inferred in this case that [an] alien was prejudiced, we are of the opinion that the alien had a fair hearing * * *." Reynolds v. United States ex rel. Dean, 68 F.2d 346, 348 (7th Cir., 1934).

Since the combination of investigative and adjudicatory functions in a single officer, absent actual bias, has been found to be constitutionally valid, the procedures employed in the present case rest on an even firmer constitutional footing. Here, the Executive Secretary of the Judicial Board did sign an affidavit in support of the original complaint against the plaintiff. This complaint, however, was only the formal basis for the initiation of proceedings against the plaintiff. Hearings before the Judicial Board concerning the complaint against Judge Keiser were held on June 1 and 2, 1970, July 20, 1970, and August 5, 1970. There is no allegation by the plaintiff (and not a scintilla of evidence to support an allegation) that the Executive Secretary's signing an affidavit in support of the complaint in any way adversely affected the conduct of the hearing before the Judicial Board or prejudiced the Judicial Board in its determination to recommend that plaintiff be removed from office.

A second crucial factor indicates that the participation of the Executive Secretary in various phases of proceedings by

the Judicial Board, and the overall conduct of proceedings by the full Judicial Board did not run afoul of the ancient maxim that "no man shall be judge in his own cause." (8 Co 114a, 118a (1610), translated from Latin, Davis, Administrative Law, § 13:01, p. 172). The determination made by the Board was not a final adjudication, but a recommendation which may be approved or disapproved by the Supreme Court of Pennsylvania. The final responsibility for evaluating the recommendation of the Judicial Board and determining the fitness of a judge to hold office rests exclusively with the Supreme Court of Pennsylvania. With this clear separation of preliminary investigative and final adjudicatory functions, plaintiff's claim of denial of due process is plainly insubstantial.

The plaintiff has claimed that his Sixth Amendment right to confront the witness against him was denied when the transcript of prior testimony of a witness, Ralph DiPiero, who did not testify at his hearing, but who was "not legally unavailable" for the hearing was admitted in evidence against him. As noted above, I have found that the proceedings before the Board were not essentially criminal in nature, and therefore no Sixth Amendment right of confrontation is involved. Apart from the specific confrontation guarantee of the Sixth Amendment, the plaintiff may be understood to contend that the introduction of the statement in question at the hearing before the Judicial Board, without an opportunity to cross-examine the witness at that time, was fundamentally unfair and constituted a denial of due process under the Fourteenth Amendment. This claim is also without merit.

At the hearing in regard to the complaint against E. David Keiser held in Philadelphia, Pa. on June 2, 1970, one Ralph DiPiero was called to testify, and was asked by an attorney for the Commonwealth to relate his knowledge of any alleged payments of money to Magistrate Keiser for his attempts to influence the disposition of matters then pending in the state courts. Mr. Di-Piero, on the advice of counsel, consistently asserted that his answers to such questions might incriminate him and therefore consistently claimed the protection of the Fifth Amendment. (Notes of Testimony, June 2, 1970, pp. 67–94) Although Judge Montgomery refused to accept DiPiero's claim of Fifth Amendment privilege and directed him to answer the questions posed by the attorney for the Commonwealth, DiPiero still refused to answer on grounds of ·possible self-incrimination. (Notes of Testimony, June 2, 1970, p. 69–70)

After Mr. DiPiero consistently refused to answer the direct questions of the Commonwealth, he was asked if he had testified on July 12, 1966 at a proceeding before the Honorable Joseph Sloan in the matter of Commonwealth v. E. David Keiser—the preliminary hearing which led to Magistrate Keiser's subsequent indictments; in regard to any questions concerning his.previous testimony on July 12, 1966, DiPiero again claimed the protection of the Fifth Amendment. Judge Montgomery again refused to accept this claim of privilege but the witness still persisted in his refusal to answer any questions concerning his previous testimony. In face of this continued refusal to respond, the Commonwealth, over objection of counsel for Judge Keiser, offered in evidence the transcript of the sworn testimony of Ralph DiPiero taken before Judge Joseph Sloan, on July 12, 1966. The testimony so admitted set forth in detail DiPiero's personal knowledge of two transactions through which Judge Keiser allegedly received $5,600.00 for his efforts to attempt to influence the outcome of two cases pending in Pennsylvania state courts. At the time of this testimony in 1966, Mr. DiPiero was duly sworn and was subjected to vigorous cross-examination by one, the plaintiffs present counsel, Morton Witkin.

Under these circumstances I find that the admission of the transcript of DiPiero's 1966 testimony to be fully

**620**

consistent with procedural due process. In California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) the Supreme Court approved the admission as substantive evidence in a *criminal trial* of a statement given at a preliminary hearing.[11] The Court stated that the witness' "preliminary hearing testimony was admissible as far as the Constitution is concerned wholly apart from the question of whether [the defendant] had an effective opportunity for confrontation at the subsequent trial." 90 S.Ct. at 1938. The Court noted that the testimony of one Porter at the preliminary hearing "had already been given under circumstances closely approximating those that surround the typical trial. Porter was under oath; respondent was represented by counsel—the same counsel in fact who later represented him at the trial; respondent had every opportunity to cross-examine Porter as to his statement; and the proceedings were conducted before a judicial tribunal, equipped to provide a judicial record of the hearings. Under these circumstances, Porter's statement would, we think, have been admissible at trial even in Porter's absence if Porter had been actually unavailable despite good-faith efforts of the State to produce him." 90 S.Ct. at 1938–1939. The Supreme Court specifically noted that "unavailability" included the claim of Fifth Amendment privilege. 90 S.Ct. at 1940.

California v. Green upheld the substantive admission of prior statements at a criminal trial when the reliability of the testimony had been previously tested by the requirement of an oath and cross-examination by counsel. Since the admission of such testimony for substantive purposes was found to be consistent the confrontation guarantee of the Sixth Amendment, then *a fortiori* the admission of such reliably tested evidence under the circumstances of the present case is consistent with the fundamental concepts of due process.

### V. EX POST FACTO LAW

The plaintiff claims that his removal from judicial office, pursuant to Article 5, Section 18 of the Pennsylvania Constitution was in violation of the constitutional prohibition against *ex post facto* laws. An evaluation of this contention requires a careful comparison of the procedures for the removal of state judges provided by the present Article 5, Section 18 and by Article 6 of the 1874 Pennsylvania Constitution, in light of the purpose and scope of the constitutional prohibition against *ex post facto* laws.

### A. ARTICLE 5, SECTION 18 AND PRIOR CONSTITUTIONAL PROVISIONS REGARDING JUDICIAL DISCIPLINE.

At the time of the misconduct with which the plaintiff was charged as a basis for his removal from judicial office, the only provisions for removal of a judge from office were found in Article 6 of the Constitution of 1874. According to Article 6, a judge could be removed from office only through (1) impeachment, (2) conviction of misbehavior in office or of any infamous crime; or (3) determination by the Governor of reasonable cause for removal, after due notice and full hearing on the address of two-thirds of the Senate.

On April 23, 1968, the procedure for removal of a judge from office was revised, with the enactment of the present Article 5, Section 18, of the Pennsylvania Constitution, effective January 1, 1969. Rules implementing this newly enacted constitutional provision were subsequently promulgated by the Pennsylvania Supreme Court, No. 512, Miscellaneous Docket No. 16. Article 5, Section 18 provides for a Judicial Inquiry and Review Board of nine members who are to investigate, hear complaints and make recommendations to the Supreme Court on matters of suspension, removal, discipline or compulsory retirement.

11. This decision has not been cited or discussed by counsel for the Commonwealth or for plaintiff.

The Supreme Court of Pennsylvania has the final responsbility for the disposition of recommendations by the Judicial Inquiry and Review Board. According to the Attorney General for the Commonwealth of Pennsylvania, the purpose of the Amendment (and the rules promulgated thereunder by the Pennsylvania Supreme Court) was "to 'update' the procedures for removal of a justice or judge * * * Article 5, Section 18 is merely part of a comprehensive revamping of the Pennsylvania judiciary [sic] which resulted from the 1967–68 Pennsylvania Constitutional Convention." (Defendants' Brief to Dismiss, p. 25.)

The conditions governing removal of a state judge prior to the enactment of Article 5, Section 18, and the reasons for its enactment are discussed in a contemporaneous study of the proposals presented to the 1967–68 Constitutional Convention:

> "Judges could be impeached for misbehavior in office, under the constitutional provisions covering impeachment of all civil officers. Also, the judges of all courts of record, except Supreme Court justices (were) subject to removal 'for any reasonable cause' by the Governor, but only at the initiation of two-thirds of each house of the General Assembly. Minor judiciary (were) removable by the Governor at the initiation of two-thirds of the Senate and after notice and hearing. The Constitutional provisions for removal of judicial officers (were) numerous, ambiguous and conflicting. Instances of removal by use of these procedures (were) extremely rare. Pennsylvania Economy League, Inc.— State Bulletin, Con-Con Edition Number 5, February, 1968, p. 3. The Constitution of 1874 of Article 5, Section 15, as amended.

### B. PURPOSE AND SCOPE OF THE PROHIBITION OF EX POST FACTO LAWS.

Against this legislative background, the validity of the application of Article 5, Section 18 to plaintiff can be considered in light of the scope and purpose of the Constitutional prohibition against *ex post facto* laws.

In Calder v. Bull, 3 Dallas, 386, 1 L.Ed. 648 (1798), Justice Chase defined four categories of *ex post facto* laws:

(1) Every law that makes an action done before the passing of the law; and which was innocent when done, criminal; and punishes such action.

(2) Every law that aggravates a crime, or makes it greater than it was, when committed.

(3) Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.

(4) Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender. (3 U.S. at 390.)

In *Calder*, the Supreme Court held that a Connecticut statute setting aside a decree of a state probate court, and granting a new hearing on the matter in controversy, was not invalid as an *ex post facto* law.

### C. REMOVAL FROM JUDICIAL OFFICE AS PUNISHMENT.

An important clarification of the form of legislative action to which the *ex post facto* prohibition applies was provided by Ex Parte Garland, 71 U.S. 333, 18 L.Ed. 366 (1866) and Cummings v. Missouri, 71 U.S. 277, 18 L.Ed. 356 (1866) decided by the United States Supreme Court shortly after the termination of the Civil War. In *ex parte Garland*, an attorney who had served as a legislative representative in the government of the confederacy had been excluded from practice before all Federal Courts because of his failure to subscribe to a loyalty oath required by Congress. In 1865, Congress had enacted a statute providing that no attorney could practice before any Federal Court without taking an oath affirming, *inter alia*, that he had

"never sought, accepted or attempted to exercise the functions of any office whatsoever, under any authority or pretended authority in hostility to the United States." 71 U.S. at 369. Although the petitioner had been admitted to practice before the United States Supreme Court in 1860 under the rules then in force, his inability to take the oath required by Congress (by reason of his holding office under the Confederacy) made him ineligible to practice in any Federal Court.

In finding this legislative prohibition of petitioner's practice of law in Federal Courts invalid as an *ex post facto* law, the Court declared that " * * * exclusion from any of the professions or any of the ordinary avocations of life for past conduct *can be regarded in no other light than as punishment for such conduct*." 71 U.S. at 370. (Emphasis added.) In the companion case to *Garland*—Cummings v. Missouri—the Supreme Court condemned as an *ex post facto* law and bill of attainder a Missouri statute requiring that a minister, in order to be licensed to follow his calling, subscribe to an oath affirming that he had never "by act or word" manifested loyalty to the Confederacy. 71 U.S. at 316. Finding that the oath requirement was intended to deprive certain persons "of the right to hold certain offices and trusts and to pursue their ordinary and regular avocation" the Supreme Court squarely held that "[t]his deprivation is punishment. * * * It is a misapplication of terms to call it anything else." 71 U.S. at 327.

For the purpose of testing the applicability of the *ex post facto* prohibition to the circumstances of the present case, it would be a "missapplication of terms" to consider the plaintiff's removal from office as anything but punishment.

Under *Garland* and *Cummings*, therefore, plaintiff's removal from judicial office must be considered punishment. The decisive question before me, therefore, is whether this form of punishment was imposed under circumstances violative of the prohibition against *ex post facto* laws.

## D. CHANGES IN SUBSTANTIVE PROCEDURAL PROTECTION.

 In Calder v. Bull, supra, Justice Chase listed as one form of *ex post facto* law "[e]very law that alters the legal rules of evidence, and receives less, or different testimony than the law required at the time of the commission of the offense, in order to convict the offender." 3 U.S. at 390. Decisions of the Supreme Court applying this definition of an *ex post facto* law have evolved a distinction between mere changes in "the modes of procedure" governing the determination of guilt and punishment and changes which materially alter or diminish the procedural protections afforded to the accused at the time of the commission of the offense. Only retroactive changes which substantially diminish procedural protections of an accused have been found to conflict with the ban against *ex post facto* laws.

At the outset, it should be clear that acceptance of *any* payment under the circumstances alleged in the complaint against Judge Keiser was prohibited conduct and a clear basis for removal from office at the time of the alleged receipt of payments by Judge Keiser.[12]

---

12. Article 5, Section 18, of the Pennsylvania Constitution of 1874, in force when plaintiff was first elected to judicial office, and at the time of the alleged misconduct in question, provided in part:
"The judges of the Supreme Court and the judges of the several courts of common pleas, and all other judges required to be learned in the law * * * shall receive no other compensation, fees or perquisites of office for their services from any source, * * *."
Article 5, Section 18 of the Constitution was repealed on April 23, 1968. Article 5, § 17(c), adopted April 23, 1968, carried out the essential intent and standards of former Article 5, Section 18, in providing:
"No justice, judge or justice of the peace shall be paid or accept for the performance of any judicial duty or for any service connected with his office, any

Decisions of the Supreme Court have upheld the validity of retroactive procedural changes against challenge as invalid *ex post facto* laws. The underlying rationale of these decisions in that the changes in question did not substantially diminish the procedural protections afforded to the accused at the time of the commission of the offense.

In Hopt v. Utah, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884) it was unanimously held that a law which made it competent for witnesses to testify to the commission of a crime who were incompetent to testify at the time the crime was committed was not an *ex post facto* law.

In Mallett v. North Carolina, 181 U.S. 589, 597, 21 S.Ct. 730, 733, 45 L.Ed. 1015 (1901) the Supreme Court upheld against challenge as an *ex post facto* law a statute authorizing an appeal from the grant of a new trial in a criminal case, as applied to cases where the trial had been held, though the new trial had not been granted, before the statute was passed. The Court in *Mallett* concluded that the challenged statute " * * * did not deprive the accused of any substantial right or immunity possessed by them [sic] at the time of the commission of the offense charged."

In Thompson v. Missouri, 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898) it was held that a Missouri statute, providing that comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine shall be permitted to be made by witnesses, and such writing and the evidence of witnesses respecting the writing may be submitted to the court and jury as evidence of the genuineness or otherwise of the writing in dispute, was not *ex post facto* when applied to prosecution for crimes committed prior to its passage. In *Thompson*, the Court quoted with approval the following observation

on *ex post facto* laws from Cooley's Treatise on Constitutional Limitations:

"Remedies must always be under the control of the legislature, and it would create endless confusion in legal proceedings if every case was to be conducted only in accordance with the rules of practice, and heard only by the courts in existence when its facts arose. The legislature may abolish courts and create new ones, and may prescribe altogether different modes of procedure in its discretion, though it cannot lawfully, we think, in so doing, dispense with any of those substantial protections with which the existing law surrounds the person accused of crime." (Ch. 9, p. 272, 5th Ed., 171 U.S. at 386, 18 S.Ct. at 924).

Does plaintiff really suggest that there should be a different and less stringent *ex post facto* standard for judges than there existed for criminal defendants in *Mallett* and *Hopt, supra.* In *Hopt*, the defendant had been convicted of murder in the first degree and sentenced to death. To accept plaintiff's argument would be to vindicate Edmund Burke's conclusion that the "law sharpens the mind by narrowing it."

■■■ Bacon, in his extraordinary essay *Of Judicature* said:

"The place of justice is a hallowed place and therefore not only the Bench, but the foot pace and precincts and purpose thereof ought to be preserved without scandal and corruption." (See Works of Lord Bacon, 59 (M. Murphy Ed. 1876.)

Chief Justice Marshall said, in Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60, it is " 'emphatically the province' of the judiciary to say what the law is. But if that be so * * * then the ancient question, Quis Custodiet Ipsos Custodes?,[13] immediately arises. Who, indeed, should put the judiciary's house in order?" (See 35 Law and Contemporary

---

fee, emolument or perquisite other then the salary and expenses provided by law."

13. "Who Shall Keep the Keepers?"—Juvenal, The Satires, Book 6, line 347.

Problems, p. 92). The Pennsylvania Constitution, through its 1968 Amendment, gives an opportunity to deal with these occasional and sporadic abuses in order to put the judiciary's house in order. Plaintiff has no constitutional right to be tried or disciplined by the exact procedures which were in effect at the time of his alleged misconduct.[14] I find that the procedures of the Judicial Board are fully fair and in no way result in the denial of any substantial procedural protection which was afforded to plaintiff at the time of his alleged misconduct. I therefore find plaintiff's *ex post facto* claim to be without merit.

14. For a general discussion of the problems of Judicial Ethics and Discipline, see Law and Contemporary Problems, Vol. 35, pp. 1–228; and particularly—"Lions or Jackals: The Function of a Code of Judicial Ethics", by Judge Irving R. Kaufman, p. 3; "Judicial Self Regulation—Its Potential", by Mr. Justice Tom C. Clark, p. 37; "Public Confidence in the Judiciary: Some Notes and Reflections", by Arthur Selwyn Miller, p. 69; "Judicial Misconduct and How Four States Deal With It", by William T. Braithwaite, p. 151. "Impeachment of Judges and Good Behavior", 79 Yale Law Review, 1475 (1970); "Judicial Removal", 84 Harvard Law Review, 1002 (1971); "The Limitations of Article 3 on the Proposed Judicial Removal Machinery", 118 U. of Pa.Law Review, 1064 (1970). "Separation of Powers: Judicial Independence", by Senator Sam J. Ervin, Jr., 35 Law and Contemporary Problems, p. 108. See also: "Disqualification of Judges: In Support of the Bayh Bill", by John P. Frank, 35 Law and Contemporary Problems, p. 43.