**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK MOOR,
            *Petitioner-Appellant,*

v.

JACK PALMER; NEVADA ATTORNEY
GENERAL,
            *Respondents-Appellees.*

No. 07-16045

D.C. No.
CV-07-00151-BES

OPINION

Appeal from the United States District Court
for the District of Nevada
Brian E. Sandoval, District Judge, Presiding

Argued and Submitted
January 15, 2010—San Francisco, California

Filed April 29, 2010

Before: J. Clifford Wallace, Procter Hug, Jr., and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Wallace

6373

**COUNSEL**

Ryan Norwood, Esq., Assistant Federal Public Defender, Las Vegas, Nevada, for petitioner-appellant Mark Moor.

Heather D. Proctor, Esq., Carson City, Nevada, for respondents-appellees Jack Palmer, et al.

---

**OPINION**

WALLACE, Senior Circuit Judge:

Petitioner Mark Moor appeals from the district court's denial of his petition for a writ of habeas corpus. We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 2253. We review the district court's denial of Moor's habeas petition de novo, *Gonzalez v. Brown*, 585 F.3d 1202, 1206 (9th Cir. 2009), and we affirm.

**I.**

In March 1994, Moor pled guilty in a Nevada state court to using a minor in the production of pornography, in violation of Nevada Revised Statutes section 200.710. He was sentenced to a term of life with the possibility of parole after five years. In April 2000, he was released on parole. In April 2002, Moor was arrested for violating certain terms and conditions of his parole. In June 2002, the Parole Board (Board) found him guilty of parole violations and revoked his parole. The Board also determined that it would next review and consider Moor for parole in three years. In 2005, he was denied parole and was told he would again be considered for parole in another three years. In his federal habeas petition, Moor challenges the 2005 denial of parole.

**A.**

Moor argues that he was punished twice for the same parole violations — once in 2002 when his parole was revoked, and then again in 2005 when he was denied parole for another three years — in violation of the Double Jeopardy Clause of the Fifth Amendment.

**[1]** We point out that Moor did not raise his double jeopardy contention in the district court. Although his federal habeas petition did take issue with the extension of his incarceration "for three (3) years, past the three (3) year parole violation term [set in 2002]", he framed this issue as one of due process, not double jeopardy. Although we have discretion to do so, *Allen v. Ornoski*, 435 F.3d 946, 960 (9th Cir. 2006), we generally do not consider on appeal issues that were not raised in the habeas petition to the district court. *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998).

**[2]** If we were to consider Moor's double jeopardy claim on the merits, it would nevertheless fail. The Double Jeopardy Clause "protects against multiple punishments for the same offense." *United States v. DiFrancesco*, 449 U.S. 117, 129 (1980), quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). But it "does not prohibit the imposition of all additional sanctions that could, in common parlance, be described as punishment . . . . The Clause protects only against the imposition of multiple *criminal* punishments for the same offense." *Hudson v. United States*, 522 U.S. 93, 98-99 (1997) (internal quotation marks and citations omitted). Parole revocation is not a criminal penalty for violating the terms of parole. *United States v. Soto-Olivas*, 44 F.3d 788, 789 (9th Cir. 1995) ("revocation is not punishment for the subsequent events which violate the parole"). It is simply a continuation of the punishment for the original crime. *Id.* Therefore, the revocation of Moor's parole in 2002 is not the type of criminal punishment that would trigger the protections of the Double Jeopardy Clause.

## B.

Moor also contends that the Board's 2005 denial of parole violated his rights under the Due Process Clause of the Fifth Amendment. First, he argues that the state's failure to release him three years after his parole revocation violated Nevada Revised Statutes section 213.1519(1)(b), which provides that,

when parole is revoked, the prisoner "[m]ust serve such part of the unexpired maximum term of his original sentence as may be determined by the Board." He urges that the Board's 2002 decision determined how much of his unexpired sentence he should serve — three years — and did not mean that he should serve three more years only to be *considered* for parole once again. At the end of three years, Moor contends, his parole should have been automatically reinstated without further review. Second, Moor argues that the Board failed to adopt and apply standards for granting parole after revocation distinct from the standards applied to an initial parole decision. He argues that such separate standards are required by Nevada Revised Statutes section 213.10885(1), which directs the Board to "adopt by regulation specific standards for each type of convicted person . . . for determining whether to grant or revoke the parole of a convicted person." Third, Moor argues that Nevada Revised Statutes section 213.142(1) requires parole hearings to be held at least every three years, yet he was turned away without a hearing in 2005.

To the extent that Moor is requesting habeas relief on the basis of the Board's violation or misapplication of Nevada statutes in and of themselves, he fails to state a basis for federal habeas relief because "alleged errors in the application of state law are not cognizable in federal habeas corpus." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996). To the extent that Moor is asserting that the Board's violation or misapplication of Nevada law violated his federal due process rights, we reject that argument as well, because Moor has no liberty interest in parole.

**[3]** The Supreme Court has held that prisoners have no constitutional right to release before expiration of a valid sentence even where a state provides for the possibility of parole. *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 7-8, 10-11 (1979). It is true that a state parole statute may *create* a liberty interest, even if the parole decision involves subjective and predictive considerations, provided

that the statute contains mandatory language and imposes substantive limitations on the discretion of those making the parole decision. *Bd. of Pardons v. Allen*, 482 U.S. 369, 375-79 (1987). We have held that

> [w]hether a state statute provides such a protectable entitlement depends on the structure and language of the statute, as well as the state courts' interpretation of the scope of the interest. . . . If a statutory scheme requires the board to release a prisoner once the board determines that certain necessary prerequisites exist, that scheme may give rise to a liberty interest in early release. . . . Significant to the determination of whether parole or other early release statutes create such a protectable liberty interest is their use of mandatory language.

*Bergen v. Spaulding*, 881 F.2d 719, 721 (9th Cir. 1989) (citations omitted).

**[4]** Nevada's statutory parole scheme, however, expressly disclaims any intent to create a liberty interest. *See* Nev. Rev. Stat. § 213.10705 (legislative declaration that "the release or continuation of a person on parole or probation is an act of grace of the State . . . . and it is not intended that the establishment of standards relating thereto create any such right or interest in liberty or property . . . ."). The statute does not use mandatory language; instead, it provides that "the Board *may* release on parole a prisoner who is otherwise eligible for parole" and lists factors to be considered in exercising that discretion. Nev. Rev. Stat. § 213.1099(1), (2) (emphasis added). The Nevada Supreme Court has held that the discretion conferred on the Board by Nev. Rev. Stat. § 213.1099 "does not confer a legitimate expectation of parole release and therefore does not create a constitutionally cognizable liberty interest" in parole. *Severance v. Armstrong*, 620 P.2d 369, 370 (Nev. 1980).

**[5]** The provisions of Nevada law specifically dealing with parole *revocation* likewise do not create a protectable entitlement to parole for a prisoner whose parole has been revoked. The law provides only that a prisoner whose parole has been revoked "[m]ust serve such part of the unexpired maximum term of his original sentence as may be determined by the Board." Nev. Rev. Stat. § 213.1519(1)(b). This statute does *not* endow Moor with a protectable interest in serving no more than the term initially identified by the Board, and it does not suggest that the Board's determination at the time of revocation is necessarily the final word. It is not inconsistent with the statutory text for the Board to decide, at the time of revocation, that a parolee should serve a certain amount of time and then be reevaluated for suitability for parole. Because Nevada law does not create a liberty interest in parole, Moor's due process claim must be rejected.

## II.

At the time of Moor's conviction, an inmate with his criminal record would be evaluated for parole according to the factors described in Nevada Revised Statutes section 213.1099. That statute directs the Board to consider

> (a) Whether there is a reasonable probability that the prisoner will live and remain at liberty without violating the laws;
>
> (b) Whether the release is incompatible with the welfare of society;
>
> (c) The seriousness of the offense and the history of criminal conduct of the prisoner;
>
> (d) The standards adopted pursuant to NRS 213.10885 and the recommendation, if any, of the Chief; and

(e) Any documents or testimony submitted by a victim notified pursuant to NRS 213.130.

Nev. Rev. Stat. § 213.1099(2); *see also* Nev. Rev. Stat. § 213.10885(2) (stating that factors to be considered by the Board "must include, but are not limited to: (a) The severity of the crime committed; (b) The criminal history of the person; (c) Any disciplinary action taken against the person while incarcerated; (d) Any previous parole violations or failures; (e) Any potential threat to society or himself; and (f) The length of his incarceration").

Prior to 1997, Nevada law provided that persons convicted of sexual assault or attempted sexual assault could not be paroled unless they were first evaluated by a Psychological Review Panel (Review Panel) consisting of an administrator from the state's department of human services (or a designee), the director of the department of prisons (or a designee), and a licensed psychologist or psychiatrist. Nev. Rev. Stat. § 200.375 (1995). In order for a prisoner subject to this law to be eligible for parole, the Review Panel had to certify that the inmate was under observation while in prison and was not "a menace to the health, safety or morals of others." *Id.* At the time of Moor's conviction, this psychological review requirement did not apply to him.

In 1997, however, the Nevada legislature broadened the requirement of psychological review as a precondition for parole. *Cf.* Nev. Rev. Stat. § 200.375 (1995) *with* Nev. Rev. Stat. § 213.1214. *See Stockmeier v. Psychological Review Panel*, 135 P.3d 807, 811 & n. 17 (Nev. 2006) (citing 1997 Nev. Stat., ch. 524, § 10, at 2506; *id.* § 22, at 2513). The 1997 revision expanded the list of offenses that would trigger the psychological review procedure, to include prisoners such as Moor who were convicted of an "offense involving pornography and a minor." Nev. Rev. Stat. § 213.1214(5)(e). The law also provided that inmates subject to psychological review procedures could not be paroled unless a Panel first "certi-

fie[d] that the prisoner was under observation while confined
. . . and does not represent a high risk to reoffend based upon
a currently accepted standard of assessment." Nev. Rev. Stat.
§ 213.1214(1).

Therefore, when Moor was first considered for parole in
1999, the Board applied section 213.1214, as it had been
amended in 1997, to him. Moor was duly certified by a
Review Panel and released on parole. After his 2002 parole
revocation and three more years of incarceration, he was
again considered for parole in 2005. Once more, the state
applied the procedures described in section 213.1214 to Moor.
A Review Panel evaluated Moor's suitability for re-release;
this time, however, the Review Panel declined to issue a certi-
fication, resulting in the denial of parole to Moor.

Moor argues that applying section 213.1214 to a prisoner
whose original conviction predates passage of that law vio-
lates the constitutional prohibition on ex post facto laws,
United States Constitution, Article I, section 10, and that
therefore the Board's use of the psychological evaluation pro-
cedures in his case was unconstitutional.

The government argues initially that, because Moor submit-
ted to the Review Panel process in 1999, he waived any sub-
sequent challenges to those requirements. Unsurprisingly, the
government offers minimal reasoning in support of this asser-
tion. Indeed, it is unclear how Moor could have brought an ex
post facto challenge in 1999, because at that time he obtained
a certification from the Review Panel and was released on
parole, and therefore suffered no harm traceable to the psy-
chological review requirement.

**[6]** Moving to the merits, the Ex Post Facto Clause prohib-
its laws that retroactively increase the penalty for a crime.
*Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995). "A
law violates the Ex Post Facto Clause if it is 1) retroactive —
it applies to events occurring before its enactment; and 2) det-

rimental — it produces a sufficient risk of increasing the measure of punishment attached to the covered crimes." *Brown v. Palmateer*, 379 F.3d 1089, 1093 (9th Cir. 2004) (internal quotation marks, citations and alterations omitted). Although the Supreme Court has not adopted "a single formula for identifying which legislative adjustments, in matters bearing on parole, would survive an *ex post facto* challenge," *Garner v. Jones*, 529 U.S. 244, 252 (2000), it has said that "[t]he question is whether the amended [rule] creates a significant risk of prolonging [the prisoner's] incarceration," and that there is no constitutional violation where the legislative change produces "only the most speculative and attenuated possibility of producing the prohibited effect." *Id.* at 251 (internal quotations and citation omitted). "[T]he focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' nor . . . on whether an amendment affects a prisoner's *opportunity* to take advantage of provisions for early release." *Morales*, 514 U.S. at 506 n.3 (internal quotation marks omitted), and "the question of what legislative adjustments will be held to be of sufficient moment . . . *must* be a matter of degree." *Id.* at 509 (internal quotation marks and citations omitted).

**[7]** Here, section 213.1214 was applied retroactively to Moor. He was convicted in 1994, and the psychological review requirement was revised and applied to him by laws enacted in 1997. His eligibility for parole was clearly impacted by a law passed after he committed his offense. *Weaver v. Graham*, 450 U.S. 24, 31 (1981) (law altering availability of credits for good behavior was retroactive because it "changes the legal consequences of acts completed before its effective date"); *Himes v. Thompson*, 336 F.3d 848, 854 (9th Cir. 2003) ("Parole eligibility affects the length of a prison term and therefore affects the measure of punishment attached to the original crime," and thus new regulations regarding re-release after parole revocation were retroactive because they affected punishment for crimes committed before the regulations were passed).

**[8]** We will therefore turn to the second question: whether the new rule "creates a significant risk of prolonging [Moor's] incarceration." *Garner*, 529 U.S. at 251; *see also Brown*, 379 F.3d at 1095 (second question of the ex post facto analysis "asks whether the retroactive statute works to some significant disadvantage to a petitioner, creating a 'significant risk' that the statute's application will increase the length of incarceration"). We do not, however, grant habeas relief where the claim was denied on the merits in state court unless the state court decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is contrary to Supreme Court precedent if a state court "applies a rule that contradicts the governing law" set forth in Supreme Court cases or "confronts a set of facts that are materially indistinguishable" from a relevant Supreme Court precedent but arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A decision unreasonably applies Supreme Court precedent if it applies, extends, or fails to extend the governing rules in a way that is not just incorrect, but objectively unreasonable. *Id.* at 409-10; *Doody v. Schriro*, 596 F.3d 620, 634 (9th Cir. 2010).

Applying the above principles, we conclude that the Nevada courts' denial of habeas relief in this case did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as embodied in Supreme Court precedent. The Nevada Supreme Court rejected Moor's ex post facto claim, reasoning that "[t]here is no ex post facto violation when the law merely

alters the method of imposing a penalty and does not change the quantum of punishment," and that "requiring [Moor] to be certified before release on parole does not constitute an additional punishment." The court did not explicitly set out the "controlling inquiry" of "whether retroactive application of the change . . . created 'a sufficient risk of increasing the measure of punishment.'" *Garner*, 529 U.S. at 250, *citing Morales*, 514 U.S. at 509. Nevertheless, the Nevada Supreme Court did cite *Morales*, suggesting that it identified the governing rule, or at least did not apply a rule that contradicted the *Morales* rule. The question then becomes whether the Nevada Supreme Court unreasonably applied the *Morales* rule to the facts of this case. *See Himes*, 336 F.3d at 852.

It is not an objectively unreasonable application of Supreme Court precedent to conclude that subjecting Moor to the Review Panel certification process would not create a substantial risk that he would serve more prison time than if he had been evaluated for parole under standards applicable at the time of his conviction, as found in Nev. Rev. Stat. § 213.1099. If the Review Panel cannot certify that a prisoner does not present a "high risk" of reoffense, that same prisoner's suitability for parole under section 213.1099 standards is doubtful: Section 213.1099 requires the Board to consider whether there is a "reasonable probability" that the prisoner will abide by the law and compatibility of the prisoner's release with "the welfare of society."

Moor argues that the Review Panel process is fundamentally different than the decisional process of the Board in typical parole determinations. He asserts that, although the Board considers a prisoner's risk of recidivism, the Board need not make any affirmative findings or consider any one factor to be dispositive of the parole determination. The Review Panel, in contrast, must affirmatively certify that the person does not pose a *high* risk of reoffending. But it is difficult to conceive of the inmate who has a significant chance of obtaining parole under the usual Board standards, but would be unable to

obtain parole because of the Review Panel certification proce-
dures. By way of comparison, in *Morales*, the Court upheld
a retroactive change to the frequency of parole hearings for
certain inmates, in part because the change "applie[d] only to
a class of prisoners for whom the likelihood of release on
parole is quite remote." 514 U.S. at 510; *see also Garner*, 529
U.S. at 256 (holding that the record did not support the con-
clusion that decreasing the frequency with which prisoners
who were convicted of multiple killings were reconsidered for
parole created more than a speculative risk of prolonging
incarceration).

Moor attempts to distinguish *Morales* and *Garner* on the
ground that those cases considered laws that changed only the
timing of parole hearings, and not the substantive standards to
be used at those hearings. Moor also argues that he is chal-
lenging a law that *restricts* the discretion of the Board, rather
than *expanding* it, as the statutes involved in *Morales* and
*Garner* had done. But these considerations were not disposi-
tive in *Morales* and *Garner*; rather, they simply aided the
Court's analysis of whether there was sufficient risk of
increased incarceration.

Moor also argues that the Review Panel throws up a "high
hurdle" that must be cleared before the Board can exercise its
discretion, similar to the hurdle held unconstitutional in *Miller
v. Florida*, 482 U.S. 423, 435 (1987). In *Miller*, the Court held
impermissible a law that retroactively revised sentencing
guidelines and required a judge departing from those guide-
lines to give clear and convincing reasons. *Id.* However, the
"hurdle" represented by the Review Panel here is not particu-
larly onerous; the Review Panel need only certify that the
inmate does not pose a *high* risk of reoffending. Moreover, it
is even *less* likely that the procedures would pose a significant
risk of prolonging incarceration for prisoners who, like Moor,
have already violated the terms of their parole once before.

**[9]** Moor urges the similarity between this case and *Brown*,
which also involved two sets of parole decisionmakers apply-

ing two different sets of standards, with one set having power to override the other's determination. But the change in law at issue in *Brown* represented a far greater threat of increased incarceration: there, the prior law permitted a parole board to postpone a parole date only if there was a professional "diagnosis of present severe emotional disturbance such as to constitute a danger to . . . the community." 379 F.3d at 1091. The new law allowed a parole board to postpone a parole date if the board believed the prisoner suffered from "a mental or emotional disturbance" that made him a danger to the community, even without — or contrary to — a professional diagnosis, and even if the disturbance was not severe. *Id.* at 1095. Thus, the law challenged in *Brown* allowed a parole board to postpone parole on less serious grounds, and without, or even in contravention of, the opinion of a mental health professional. Here, under section 213.1214, the Board retains the same basic discretion to grant or deny parole; the Legislature simply requires a specialized panel (including a psychologist or psychiatrist) to first make a threshold inquiry of whether the inmate poses a "high risk to reoffend," a consideration which would be relevant to the Board's section 213.1099 analysis anyway. In *Brown*, importantly, we gave less deference to the state court's denial of Brown's habeas petition, because the state courts had "provided no *ratio decidendi* to review." *Brown*, 379 F.3d at 1092, citing *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

**[10]** We therefore hold that the psychological review requirement does not create a significant risk of increased punishment on its face. Where, as here, "the rule does not by its own terms show a significant risk, the respondent must demonstrate . . . that its retroactive application will result in a longer period of incarceration than under the earlier rule," such that "as applied to his own sentence the law created a significant risk of increasing his punishment." *Garner*, 529 U.S. at 255. Moor expressly argues that further factfinding is unnecessary, choosing to rest his ex post facto claim on a

facial challenge to the statute. A remand is thus unnecessary and Moor's facial ex post facto challenge is rejected.

**AFFIRMED.**